IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAWN GADSON, individually and on behalf of others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>STELLE CORPORATION,<br><br>    Defendant. | Case No. |

**CLASS ACTION COMPLAINT**

Plaintiff Shawn Gadson brings this case individually and on behalf of others similarly situated against Defendant Stelle Corporation ("Stelle") for breach of contract, common law fraud, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2, and the Truth in Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2). Plaintiff brings his claims as a putative class action.

**NATURE OF THE CASE**

1. This case involves a classic bait-and-switch scheme meant to trick truck drivers and circumvent the lease protections of the TILA. Defendant advertised to the public, and promised Plaintiff through its recruiters, that it would pay semi-truck owner-operators or lease-operators (hereinafter, "drivers")[1] a fixed percentage of the revenue for each load they hauled

---

[1] Plaintiff uses the term "drivers" to refer to individuals who have "leased" their equipment to Defendant to transport loads in interstate commerce. Defendant contracts with individuals who have trucks they either own or lease (sometimes called "owner-operators" or "lease-operators") to "lease" those individuals' equipment—with or without the driver—for the purpose of transporting loads in interstate commerce.

under Stelle's carrier license. Then, when Plaintiff began work, Defendant consistently paid Plaintiff less than the agreed upon percentage of the loads he transported.

2. Through the conduct described above, Defendant engaged in a widespread scheme to mislead Plaintiff and other drivers about the amount of money they would receive in exchange for hauling loads under Stelle's carrier license. Defendant effectuated its scheme by, among other things, advertising and promising through its recruiters that Plaintiff would receive a fixed percentage of the price of the loads Plaintiff hauled, lying on Plaintiff's settlement statements about the gross revenue for each load and sending Plaintiff rate confirmation sheets from freight brokers with the price of the load altered.

3. Defendant violated the ICFA and committed fraud by intentionally misleading Plaintiff about the amount of money Defendant would retain from each load that Plaintiff transported if Plaintiff leased a truck with Defendant. Defendant also breached its contracts with Plaintiff and violated the TILA by paying Plaintiff less than the agreed upon percentage of revenue Defendant received for each load Plaintiff hauled with its equipment.

## Parties

4. Plaintiff Shawn Gadson, a South Carolina resident, is an interstate truck driver. He has a CDL Class A license and worked for Defendant as an owner-operator from approximately December 2021 to June 2022. During all times that Gadson worked for Defendant, he was not an agent of Defendant for the purposes of the TILA.

5. Defendant Stelle Corporation is an Illinois business corporation with its principal place of business in Lemont, Illinois. Stelle is a federally regulated motor carrier providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

6. Stelle is registered under MC-1422, US DOT # 2955121. According to the SAFER – FMCSA management information systems, Stelle reported that it operates 165 power units (trucks) and 110 drivers as of May 5, 2023. Further, Stelle reported that it ran approximately 7 million miles in 2022.

## Jurisdiction and Venue

7. The Court has subject matter jurisdiction over this action pursuant to the TILA, 49 U.S.C. § 14704 and 28 U.S.C. § 1331.

8. The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because class members are citizens of multiple states and the amount in controversy exceeds $5 million.

9. Venue is proper in this jurisdiction under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(a), (b), and (c) because a substantial part of the events and omissions giving rise to this action occurred in the Northern District of Illinois.

## Legal Standards

10. The TILA and its implementing regulations govern the terms and conditions under which owner-operator truckers lease equipment to federally authorized motor carriers that transport freight in interstate commerce. *See* 49 U.S.C. § 14102(a); 49 C.F.R. § 376.12. TILA regulations require the motor carrier's equipment leases to disclose, in writing, the amount that the motor carrier will pay the owner-operator as compensation. 49 C.F.R. § 376.12(d). When the lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the carrier will provide the lessor a copy of the rated freight bill, or any other documentation actually used for a shipment containing the same information, before or at the

time of settlement. *Id*. at 376.12(g). Finally, the regulations require the motor carrier to adhere to the terms of the lease. *Id.* § 376.12 (introductory paragraph).

11. The ICFA prohibits both deceptive practices and unfair business practices, including unfair business practices that offend public policy. 815 ILCS 505/2; *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417–18 (2002).

## Common Facts

**A. Defendant Illegally Misrepresents Load Prices and Underpays Plaintiff.**

12. After Plaintiff applied to drive for Defendant, a recruiter for Defendant called Plaintiff and told him that Stelle would pay him a percentage of the gross receipts for each load and directed him to attend orientation at Stelle headquarters.

13. Plaintiff traveled to Defendant's headquarters, incurring costs to do so, based on Stelle's promise that it would pay Plaintiff a percentage of the price of the loads he hauled.

14. Plaintiff entered into a written contract with Defendant wherein Stelle agreed to pay Plaintiff 80% of gross receipts for each load.

15. Plaintiff owned his truck and had exclusive use of the semi-truck he leased during his contractual relationship with Defendant.

16. Defendant's dispatchers contacted Plaintiff and offered him "loads" to transport at a specific price. Plaintiff determined the amount of money he would receive for transporting the load by calculating eighty percent of the price the dispatcher quoted.

17. At all times, Plaintiff reasonably believed, based on representations that Defendant made to him, that Defendant would pay him a percentage of the revenue Defendant received for each load Plaintiff hauled.

18. Paying drivers based on a percentage of the price of the gross revenue the carrier receives for a load is the trucking industry's dominant model of compensating owner-operators who lease their trucks. As of 2021, three out of every four leased owner operators were paid based on a percentage of the carrier's revenue for each load.[2]

19. Defendant misrepresented and under-reported the price of Plaintiff's loads to Plaintiff. Defendant then paid Plaintiff eighty percent of the lower, underreported amount, in violation of its agreements with Plaintiff.

20. On at least two occasions, a third-party broker responsible for booking a load that Plaintiff hauled for Defendant informed Plaintiff that the price Defendant reported to Plaintiff was incorrect. On each occasion, the broker told Plaintiff that the shipper was paying Defendant a higher price for the load than Defendant told Plaintiff.

21. On February 22, 2022, Plaintiff delivered a shipment from Bradford, PA to Bristol, PA. Prior to delivering the shipment, Defendant's dispatcher emailed Plaintiff a secretly altered load confirmation sheet between Defendant and broker Transfix. The falsified load confirmation stated that the price of the load was $1,500. Ex. 1. Later, on December 14, 2022 Transfix informed Plaintiff that the real load price was $2,200. Defendant lowered the price on the rate confirmation by $700, using Adobe or some similar software, and Plaintiff relied on the falsified load confirmation to his detriment. He would not have agreed to take the load for $1,500 if he knew the shipper was actually paying Defendant $2,200 to transport the load.

---

[2] Driver compensation, part 3: Percentage is king for leased owner-operators, long after the rise of miles post-deregulation, Overdrive, https://www.overdriveonline.com/business/article/15066619/compensation-percentage-pay-dominates-among-ownerops.

22. On December 28, 2021, Plaintiff delivered a shipment from Blythewood, SC to Baldwin, WI. Prior to delivering the shipment, Defendant's dispatcher emailed Plaintiff a secretly altered load confirmation sheet between Defendant and broker Echo Global Logistics. The falsified load confirmation stated that the price of the load was $3,000. Ex. 2. Later, on December 15, 2022, Echo Global Logistics informed Plaintiff that the real load price was $3,800. Defendant lowered the price on the rate confirmation by $800, using Adobe or some similar software, and Plaintiff relied on the falsified load confirmation to his detriment. He would not have agreed to take the load for $3,000 if he knew the shipper was actually paying Defendant $3,800 to transport the load.

23. Plaintiff's settlement sheets displayed adjacent columns that listed the gross receipts for each load driven during the pay period, a "rate" multiplier representing the driver's share of gross receipts (e.g., .8 for 80%), and a "total" reflecting the amount of the load multiplied by the rate. *See* Ex. 3.

24. Dispatchers for Defendant misrepresented to Plaintiff that the load prices they were quoting represented the actual gross revenue Defendant received for each load.

25. Dispatchers for Defendant purposely omitted and concealed from Plaintiff the fact that Defendant was taking more than 20% of the price of each load.

26. Plaintiff would not have agreed to transport loads under Defendant's carrier license if he knew he was being paid less than 80% of the revenue Defendant received for each load, and instead he would have contracted with a different carrier paying as much or more than Defendant had promised to pay him.

27. Defendant violated the TILA rules by not adhering to the terms of its lease agreements with Plaintiff. 49 C.F.R. § 376.12 (intro paragraph).

28. Defendant deducted money from Plaintiff's pay for an escrow account, but never repaid it to him after they stopped working for Defendant. Defendant had no contractual basis for keeping his escrow money, and it routinely kept other drivers' escrow money without contractual basis after they stopped driving for the company.

29. Defendant never paid interest on any of the escrow deductions that it took from Plaintiff's or the other putative class members' pay.

**B. Defendant Engaged In These Illegal Actions On A Classwide Basis**

30. During the past five years alone, Defendant has collectively contracted with hundreds of lessors/owner-operators to provide transportation service for its clients.

31. On information and belief, Defendant has entered into substantively identical lease agreements with hundreds, if not thousands, of drivers promising to pay them a percentage of the load price.

32. It was Defendant's uniform policy to misrepresent to drivers through advertising and standard recruiting practices that they would pay a certain percentage of the gross receipts of all loads they hauled under Defendant's carrier license.

33. On information and belief, it was Defendant's uniform policy to intentionally deceive drivers into believing that the load price quoted by Defendant's dispatchers and in altered rate confirmation sheets was the actual price of the load.

## Class Allegations

34. Plaintiff brings this action on behalf of himself and the following class of similarly situated individuals or entities, defined as:

> All individuals or entities that contracted with Defendant as lessors/owner operators from May 11, 2013 to the present and that were paid based on a percentage of the load rate.

35. The Class defined above satisfies the requirements of Rules 23(a) and 23(g).

   a. **Numerosity.** The Class is so numerous that joinder of all members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.

   b. **Commonality.** Common questions of law and fact predominate over individual issues affecting only individual class members. Questions of law and fact common to the Class include, among others, the following:

      i. Whether Defendant intentionally misrepresented to drivers that they would pay them a percentage of the revenue Plaintiff received for each load they hauled under Stelle's carrier license;

      ii. Whether Defendants' breached their lease agreements with Plaintiff and other drivers by paying them less than the promised percentage of the load;

      iii. Whether Plaintiff and other drivers were consumers for purposes of the ICFA.

      iv. Whether Defendants refused to repay escrow deposits in violation of the TILA;

      v. Whether Defendants failed to pay interest on escrow deposits;

   c. **Typicality**. Plaintiff's claims are typical of the Class's claims because Plaintiff and all Class members were injured through Defendant' uniform misconduct. The claims of Plaintiff and the Class arise from the same operative facts and are based upon the same legal theories. There are no defenses unique to Plaintiff.

   d. **Adequacy.** Plaintiff will fairly and adequately protect and represent the interests the Class because (i) Plaintiff has retained competent and experienced

counsel that have the time, experience, and resources to litigate this case; (ii) Plaintiff is a member of the Class, his claim is typical of the Class, and he has suffered substantially similar injuries to those suffered by the rest of the Class; (iii) Plaintiff's interest in obtaining monetary relief for the Class is consistent with and not antagonistic to the interests of the Class.

36. The proposed Class satisfies the requirements of Fed. R. Civ. P. 23(b)(3).

   a. **Predominance**. Common questions predominate over any individual questions because the important and prevalent issues in this case concern Defendant's conduct and its effects, which are common to the Class. Individual issues are minor and may be nothing more than damages calculations pursuant to a formula.

   b. **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by Plaintiff and the Class, while collectively substantial, are relatively small per Class member compared to the burden and expense required to individually litigate their claims. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Both liability and damages can be determined in one class-wide proceeding.

## Count I - Breach of Contract

37. Plaintiff incorporates all prior allegations as if fully stated herein.

38. Defendant agreed to pay Plaintiff a percentage of the gross receipts of the loads he hauled under Defendant's carrier license.

39. Defendant affirmatively misrepresented to Plaintiff that it was paying him a specified percentage of the load revenue, and instead paid him less than that amount.

40. Defendant underreported the price of the load to Plaintiff.

41. Plaintiff substantially performed all his obligations under his contract with Defendant.

42. Defendant breached its contract with Plaintiff by not paying him the agreed upon percentage of the real rate that brokers or shippers paid to Defendant.

## Count II - Truth in Leasing Act

43. Plaintiff incorporates all prior allegations as if fully stated herein.

44. Defendant Stelle is a motor carrier licensed with the U.S. Department of Transportation. Plaintiff owned his truck that he leased to Stelle for purposes of TILA.

45. Under the TILA regulations, an authorized carrier may perform authorized transportation in leased equipment only if the written lease granting the use of the equipment meets the requirements of 49 C.F.R. § 376.12.

46. Under the regulations, the required lease provisions must be "adhered to and performed by the authorized carrier." *Id.* § 376.12 (introductory paragraph). The TILA also requires that carriers provide copies of the rated freight bill to owner-operators who are paid a percentage of the price of the load. *Id.* § 376.12(g).

47. Defendant did not adhere to the terms of the lease agreement because it paid Plaintiff less than the percentage of the load rate they promised to pay them.

48. Defendants violated the TILA by not paying interest on escrow deductions and by refusing to return Plaintiffs escrow deposits. *Id.* § 376.12(k)

49. Under 49 U.S.C. §14704(a)(2), Defendant is liable to Plaintiff for the damages that he suffered on account of Defendant's regulatory violations.

### Count III – Illinois Consumer Fraud And Deceptive Business Practices Act

50. Plaintiff incorporates all prior allegations as if full stated herein.

51. Defendant advertised to Plaintiff and the general public that it would pay between 80% of the revenue from each load truck drivers transported under Defendant's carrier licenses.

52. Plaintiff is a "consumer" under the ICFA for reasons that include because he contracted with Defendant for the provision of services, namely the service of dispatching and negotiating loads and allowing Plaintiff to drive under Defendant's carrier license. See 815 ILCS 505/1(b), (e).

53. Defendant's recruiters affirmatively misrepresented to Plaintiff that he would receive 80% of the load revenue and Defendant would keep 20% of the load revenue. They also send them fabricated rate confirmation sheets.

54. Defendant's dispatchers affirmatively misrepresented to Plaintiff that the load prices it quoted to Plaintiff for each load reflected the actual total load revenue, when in fact Defendant's dispatchers underreported the price of each load.

55. Defendant engaged in both deceptive practices and unfair business practices in the conduct of its business, in violation of 815 ILCS §§ 505/2, 510/2(a), by engaging in the acts and practices alleged herein.

56. Plaintiff reasonably believed, based on Defendant's representations, that Defendant was paying him the agreed upon of the revenue Defendant received for each load.

57. Defendant's actions implicated consumer protection concerns.

58. Plaintiff was injured by Defendant's unfair and deceptive acts because he was not paid the amount that Defendant promised to pay him and that Plaintiff reasonably believed he would be paid.

59. Plaintiff was injured by Defendant's unfair and deceptive acts because he would not have transported loads for Defendant if he knew Defendant was retaining more than the agreed upon share of the load price. Instead, he would have driven for a different carrier that paid more money.

## **Count IV – Common Law Fraud**

60. Plaintiffs incorporate all prior allegations as if fully stated herein.

61. Defendant made numerous false statements to Plaintiff concerning the actual freight rates, or prices of the loads, that Defendant's customers paid Defendant for drivers' deliveries.

62. Defendant altered load confirmation sheets to make the load prices appear lower than the prices that Defendant's customers actually paid to Defendant.

63. Defendant then sent the fraudulent load confirmation sheets to Plaintiff to make him falsely believe that Defendant was paying him in accordance with his work contract.

64. Defendant knowingly provided Plaintiff with falsified load confirmations.

65. Plaintiff had no reason to question the authenticity of the fraudulently modified load confirmation sheets.

66. Plaintiff reasonably and justifiably relied upon the false load confirmation sheets as though they were authentic.

67. Plaintiff incurred substantial damages in the form of underpayments for the services he offered because of Defendant's fraud.

68. Defendant's conduct was fraudulent, egregious, and malicious and justifies an award of punitive damages.

## Prayer for Relief

Plaintiff, individually and on behalf of the Class, respectfully prays for the following relief:

   a. An order certifying the Class as defined above, appointing Plaintiff's counsel as Class Counsel, and appointing Plaintiff as class representative;

   b. An award of all economic, monetary, actual, consequential, and compensatory, damages available under the law;

   c. An award of restitution and disgorgement;

   d. An award of all equitable relief requested herein;

   e. An award of reasonable litigation expenses and attorneys' fees;

   f. An award of pre- and post-judgment interest, to the extent allowable; and

   g. Other further relief that the Court deems just and reasonable.

## Jury Demand

Plaintiff demands trial by jury on all issues as to which a jury trial is available.

Date: May 11, 2023

Respectfully submitted,

/s/ Christopher J. Wilmes
One of the Attorneys for the Plaintiff

Christopher J. Wilmes
cwilmes@hsplegal.com
Tex Pasley
tpasley@hsplegal.com
Hughes Socol Piers Resnick & Dym
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100